31523. ATLANTA, BIRMINGHAM & COAST R. CO. *v.* PATTERSON.

DECIDED MAY 21, 1947.

*Matthews, Long & Moore,* for plaintiff in error.

*Sapp & Ewing, H. J. Quincey,* contra.

MacIntyre, P. J. ■ In deciding demurrers, both general and special, to the petition when this case was formerly before this Court for review in *Atlanta, Birmingham & Coast Railroad Company* v. *Patterson,* supra, it was said: "The petition was also demurred to on the ground that it failed to show that the plaintiff was the lawful holder of the bill of lading, and therefore he was not entitled to recover the damages sued for. In view of the amendments to the original petition, the ground is without merit."

Does the evidence in the instant case support the allegations of the petition which, if proved, this Court held would authorize the plaintiff to bring this suit? After a careful examination of the pleadings and the record in this case when it was formerly before this Court and in the present case, we are of the opinion that the evidence supports the allegations of the plaintiff's petition and authorized the plaintiff to maintain the suit in his own name for himself and for the use of Jesse Perry.

Upon the trial of the case now under review the evidence authorized the finding that C. L. Patterson and Jesse Perry had each purchased some mules from Renfroe & Ballard Auction Company in Troy, Alabama; that they had paid for the mules in full; that they, Patterson and Perry, had instructed Renfroe & Ballard to act as their agent and ship the mules to Douglas, Georgia; that according to instructions Renfroe & Ballard shipped the mules on

the through bill of lading here in question to C. L. Patterson C. Co., consignee; and that some of the mules of both Patterson and Perry died within twenty-four hours after delivery to the consignee as a result of improper feeding or watering.

During the trial of the case the bill of lading or Uniform Live Stock Contract, a form of contract used for shipments of live stock and wild animals instead of a Uniform Bill of Lading, was introduced in evidence without objection. This contract was issued by the Atlantic Coast Line Railroad Company at Troy, Alabama, to Renfroe & Ballard as shippers, and C. L. Patterson C. Co., Douglas, Georgia, was named as consignee. Under the contract twenty-four mules were to be transported; the contract was signed by J. W. Renfroe as consignor and shipper's agent; and H. B. Jernigan signed the contract for the Atlantic Coast Line Railroad Company.

The transfer of such bill of lading was as follows: "For a valuable consideration, and to protect our interests, we, the undersigned, hereby transfer, set over and assign unto C. L. Patterson, all of our right, title, interest, equity, claim and demand in and to that certain bill of lading issued at Troy, Alabama, on December 21st, 1944, to Renfroe & Ballard (Shipper's name), showing consignment to C. L. Patterson C. Co., Destination Douglas, Georgia, of 24 head of mules, weight 2300 min., with full substitution in the premises. This June 30, 1945." This document was signed by C. L. Patterson C. Co. by C. L. Patterson, owner, and by Jesse Perry, and the execution thereof by C. L. Patterson C. Company and Jesse Perry was proved. This transfer was in the exact words and figures as the one alleged in the petition under review in *Atlanta, Birmingham & Coast Railroad Company* v. *Patterson,* supra.

C. L. Patterson testified that such transfer was made by C. L. Patterson for C. L. Patterson C. Co. to C. L. Patterson. This transfer gave to C. L. Patterson, the transferee, the same rights "in and to the bill of lading" that the transferor, C. L. Patterson C. Co., had. The only objection to either the copy bill of lading or the original assignment or transfer, which were offered as one tender and allowed in evidence, was: "We object to the transfer, if it is made for the purpose of showing authority in C. L. Patterson for the reason that the transfer of the bill of lading would

not be sufficient to pass title, and not sufficient to pass such interest, as would entitle C. L. Patterson to bring the suit for himself and for Jesse Perry. If it was effected to pass title the suit is improperly brought for Patterson himself, and for Perry as usee, because the usee would not be a proper party. It would not afford any basis for the maintenance of the suit in the name of C. L. Patterson for the reason that under the testimony that W. S. Patterson is also a member of C. L. Patterson and Company and there is no transfer on this bill of lading by W. S. Patterson. The bill of lading and the transfer combined would not be competent as a basis for the maintenance of the suit."

The evidence does not show that W. S. Patterson had any interest, legal or equitable, in the mules, and the interest of W. S. Patterson, if any, in the mules will not be considered in the discussion of this objection.

As consignee in such bill of lading, C. L. Patterson C. Company had a legal or nominal right to sue for the use of C. L. Patterson and for the use of Jesse Perry, each of whom had an equitable or real interest in certain of the mules in question. Bruner *v.* Chicago & E. I. Ry. Co., 87 Ind. App. 374 (161 N. E. 680) ; *Terrell* v. *Stevenson,* 97 *Ga.* 570 (25 S. E. 352). C. L. Patterson C. Co., however, did not bring such a suit, but a few days before the present suit was brought the transfer quoted above was made by C. L. Patterson C. Co. and Jesse Perry to C. L. Patterson, and he brought the suit for himself in his own name and also for the use of Jesse Perry.

Hence, in so far as the right of action of Jesse Perry because of the death of his mules is concerned, C. L. Patterson, under the evidence, had a legal or nominal interest and could maintain a suit for their value in his own name for the use of Jesse Perry, and in so far as the right of action of C. L. Patterson is concerned, he having an equitable or real interest and then having acquired the legal interest before suit as well, he could sue for the value of his mules in his own name. *Woodbridge* v. *Drought,* 118 *Ga.* 671 (2) (45 S. E. 266) ; *Sherrill* v. *Pace,* 71 *Ga. App.* 300 (2) (30 S. E. 2d, 793). The fact that Perry signed a transfer of the bill of lading does not change the situation, for the evidence shows this transfer conveyed only a legal or nominal interest and not his equitable or real interest. *Layton* v. *Central of Ga. Ry. Co.,* 40

*Ga. App.* 330 (149 S. E. 431) ; Davis *v.* Livingston, 13 Fed. 2d, 605, 607 ; *Hill* v. *Shaw,* 189 *Ga.* 294 (5 S. E. 2d, 778) ; *Germania Bank* v. *Collins,* 113 *Ga.* 1010 (39 S. E. 421).

Considering the bill of lading and the transfer thereof together. in connection with the other evidence in the case, the action could be maintained in the name of C. L. Patterson for himself and for the use of Jesse Perry.

■ Special ground two. The trial judge admitted in evidence over the objection of the defendant a purchase invoice which lists the descriptive number and the price of each mule sold to Jesse Perry. The defendant made the following objection: "We object for the reason that the invoice was made by Renfroe and Ballard and represents the sale by that auction company to Jesse Perry, and described certain things which were indicated by ` certain numbers and figures which was said to represent certain mules, but it is made to Jesse Perry and it would not be competent proof in support of the claim of C. L. Patterson for himself or for the use of Jesse Perry." No other objection was made to the admission of this document.

The purchase invoice tended to show that the mules of Perry were purchased by Perry and paid for in full by him, and, with the other testimony in the case, it showed that Perry had a perfect equitable interest in whatever was recovered because of the death of such mules, and C. L. Patterson, to whom only the bill of lading had been transferred, had the legal or nominal interest which would authorize a suit by C. L. Patterson for the use of Perry. The purchase invoice was admissible for this purpose. See, in this connection, the preceding division of this opinion. Special ground two is not meritorious.

■ In special ground four it is insisted that the court erred in admitting in evidence certain photographs of the unloading pen of the Atlantic Coast Line Railroad at Waycross, Georgia, over the objection of the defendant: "They (the pictures) were not made by either of the witnesses that have testified, and any statement that they (the witnesses) may have made as to the correct portrayal of the premises would be their opinion. Neither (witness) has testified from what point the several pictures were made; it has been testified that they were made by Mr. Billy Patterson. Mr. Billy Patterson is in court and if they want to render

■

these pictures admissible in evidence they can do it very readily by having Mr. Patterson, who is said to have made the pictures, testify. Under the testimony as it stands at the present time, I insist that they have not been sufficiently identified to entitle them in evidence." The contention of the defendant is untenable.

Dr. Shirley, witness for the plaintiff, testified in part as follows: "I only went to Waycross once. That was Christmas day, 1944. These pictures (indicating) were taken on that day by Billy Patterson. . . I wouldn't say we were taking them designedly to the best advantage for the claimants. We were trying to find out what was wrong with the mules." Dr. Shirley also testified that the pictures were a faithful portrayal of the condition which existed at the unloading pen in Waycross. We are of the opinion that the court did not err in admitting the photographs in evidence over the quoted objection of the defendant. *Coffee County* v. *Denton,* 64 *Ga. App.* 368, 373 (13 S. E. 2d, 209) ; *Georgia Power Co.* v. *Gillespie,* 48 *Ga. App.* 688 (8) (173 S. E. 755).

■ In special ground five the defendant contends that the trial court erred in excluding from evidence a report of the U. S. Department of Commerce Weather Bureau. This record covered the month of December, 1944, and listed the temperature, precipitation and prevailing wind direction for each day. The record was a carbon original and appeared to be signed by F. W. Myrick, the co-operative observer for the bureau.

No foundation was laid for the introduction of the document; no evidence was introduced to identify the document or the person making it. The court did not err in excluding such document from evidence.

■ In special grounds six, seven, eight, nine, and ten, the defendant contends that the trial judge erred in refusing to instruct the jury in the language embodied in five separate written requests to charge which were submitted to the court by the defendant at the proper time.

Each of the requests is predicated upon the contention of the defendant that the plaintiff must show negligence on the part of the defendant, and that the defendant is liable on a through bill of lading in an interstate shipment only for its own negligence and not for the negligence of a connecting carrier. This question was decided adversely to the contention of the defendant in *Atlanta,*

*Birmingham & Coast Railroad Company* v. *Patterson,* supra, where this Court stated that the delivering carrier, as well as the initial carrier, is liable for all damage to property, received for interstate transportation by the initial carrier, on a through bill of lading, caused by any of the participating carriers.

The trial judge properly declined to instruct the jury as requested by the defendant.

■ Except for the first proviso, the trial judge included all of 49 U. S. C. A. § 20 (11) in his instructions to the jury. The present suit is based upon this section of the U. S. Code. The defendant maintains by argument that portions of the section included in the instructions to the jury were not applicable and not adjusted to the facts in the case as presented by the evidence and were harmful and misleading.

We agree with counsel that portions of the section were not applicable and were not authorized by the evidence, but to read an entire code section of which a part is inapplicable to the case on trial is not necessarily ground for reversal; however, a new trial may be granted by the trial judge if he deems that the jury were misled. 53 Am. Jur., Trial, § 542; 3 Am. Jur., Appeal and Error, § 1120.

We are satisfied that the excerpt from the charge here complained of was not calculated to mislead the jury and was not harmful or prejudicial to the defendant. *Akers* v. *Kinney,* 73 *Ga. App.* 456 (2) (36 S. E. 2d, 844); *Brown* v. *State,* 125 *Ga.* 281 (54 S. E. 162); *Slaughter* v. *Heath,* 127 *Ga.* 747 (4) (57 S. E. 69, 27 L. R. A. (N. S.) 1); *Floyd* v. *State,* 143 *Ga.* 286 (3) (84 S. E. 971).

■ We shall now consider the general grounds. The plaintiff contended that the mules in question were received by the common carrier on a through bill of lading for interstate shipment and that the mules were not delivered by the carrier in good condition and died within twenty-four hours after delivery by the carrier. In paragraph eight of his petition, the plaintiff alleged: "On account of having been permitted, while in the hands of said carriers, to drink contaminated and polluted water and/or to eat unwholesome and poisonous feed, said mules were not by said carriers safely transported to consignee and died within approximately twenty-four (24) hours after they were delivered to consignee at Douglas, Georgia."

The defendant contended that the mules were received by the carrier without any visible or manifest injury; the defendant denied that the mules were delivered by them in a damaged condition. The defendant disclaimed any liability for the loss or damage to the mules in question, averring that it was free from liability for mishandling, mistreatment, or damages, directly or indirectly to the mules in question, or from any fault resulting in their death.

The defendant contended further that the burden does not shift but remains all the while upon the plaintiff. The following rules of practice have been stated in Illinois Cent. R. Co. v. Word, 149 Ky. 229 (147 S. W. 949) : "Where the live stock is accompanied by the owner or his agent or representative, and injury results while in transit, the burden is upon the owner to show how the injury occurred; that is to say, that it was due to some negligence of the carrier. L. & N. R. R. Co. v. Hawley, 10 Rep. 117; C., N. O. & T. P. Ry. Co. v. Grover, 11 Rep. 236; L. & N. R. R. Co. v. Wathen, 22 Rep. 85.

"(2) Where the live stock is not accompanied by the owner or his agents or representative, and injury results in transit, it is incumbent upon the owner to show that the stock, when delivered to the carrier, was in good condition, and when received from the carrier at its destination was in a damaged or injured condition. Thereupon the burden shifts, and it devolves upon the company to show that the cars in which the stock was shipped were in good condition and suitable for that purpose, were handled with reasonable dispatch, and were not subjected to any rough or improper treatment during the journey, and the company, in addition, must satisfactorily account for the injured condition of the stock; and, unless the carrier can show that such injury is due to some inherent vice of the animal, the fact that it is injured will be accepted as prima facie evidence of negligence on the part of the carrier. Southern Express Co. v. Fox, 131 Ky. 257 [115 S. W. 184, 117 S. W. 270, 133 Am. St. Rep. 241]; Kelly v. Adams Express Co., 134 Ky. 208 [119 S. W. 747].

"These rules of practice apply to all cases where death or injury, for which a recovery is sought, results from some external agency; but, where a recovery is sought for sickness of live stock in transit, or for death resulting from sickness, the burden does

not shift, but remains all the while upon the plaintiff; for the sickness, or death from sickness, of the animal may be due to a diseased condition existing at the time of or prior to its shipment, though undiscovered by its owner or the carrier, or may be due to atmospheric, climatic, or other conditions over which the carrier has no control, and for which it would, in no event, be responsible."

These rules were adopted and applied as complete within themselves in the case of livestock in Bloecher & Schaaf Inc. *v.* Pennsylvania R. Co., 162 Md. 463 (160 Atl. 281), and cited with approval in Louisville & N. R. Co. *v.* Strickland, 219 Ala. 581 (122 So. 693).

The plaintiff alleged in his petition that the defendant was negligent in the respects named in paragraph eight quoted above, and in addition thereto he also alleged facts indicating the relationship between him and the carrier as that of shipper and carrier and that the mules were delivered to and accepted by the carrier in that capacity. This added subject-matter becomes material in the discussion of the controversy here. Liability for the loss of the kind here involved may arise from a contract or tort, and both principles may be relied upon as a basis for recovery, unless the plaintiff is required to elect his remedy. The actions here are based upon contract as well as upon negligence, and if the record is sufficient for recovery upon the former basis, the latter need not be proved. In other words, the negligence may be treated as surplusage. *Louisville & Nashville Railroad Company* v. *Warfield,* 129 *Ga.* 473 (59 S. E. 234); McCoy v. Wabash Ry. Co., 210 Iowa 1075 (231 N. W. 353); Alexander Eccles & Co. *v.* Strachan Shipping Co., 21 Fed. 2d, 653, 655 (citing *Louisville & Nashville Railroad Company* v. *Warfield,* supra).

The defendant also contends that section 1a of the bill of lading, the contract, when properly construed, places the burden upon the plaintiff. We can not agree with this. This section of the bill of lading provides that the carrier shall not be liable for injury or death to livestock in transit resulting from causes therein named unless caused by the negligence of the carrier or its employees. We do not find anything to warrant the interpretation or construction that the burden is thereby shifted or that it was intended to have that effect. It simply stated the liability of the carriers without saying upon whom the burden of proving the negligence

of the defendant should be imposed. Bloecher & Schaaf Inc. *v.* Pennsylvania R. Co., supra.

It is contended by the plaintiff that the record discloses that the loss was due to human agency, and, therefore, it was encumbent upon the defendant carrier to set up and prove as a defense that its duty in the premises was fully performed. It is contended by the defendant that the mules were delivered by it in good condition and that upon such an issue the burden of proof remained all the while upon the plaintiff and the defendant was merely put upon proof to absolve itself from negligence.

The evidence of the plaintiff shows that the mules were received by the carrier in an apparently good condition; Dr. W. S. Reynolds, Veterinary Inspector of the Bureau of Animal Industry of the State of Alabama, certified that he had examined the mules and found them "free from all external symptoms of any contagious or infectious diseases, also ticks."

C. L. Patterson testified in part: "The mules were turned over to us [by the carrier]. I had men lead three or four of them— just walk them to the barn. Three or four at a time. They lead three and and sometimes lead four and sometimes two. I didn't notice any manifest or visible injury or damage done to the mules at the time I received them [from the carrier]. We got them out of the cars ourselves. . . I didn't feed them anything before I watered them. And I didn't feed them anything but that hay, and I let them stay in there a little while, and I turned them out in the lot. It was a sunshiny afternoon, and I didn't see a thing the matter with them, only they looked mighty drawed, and I thought that was because they stayed on the road so long, and I didn't think there was anything serious the matter with any of them."

Jesse Perry, witness for the plaintiff, testified: "These mules were in good condition when we bought them on the 20th at Troy, Alabama. At least, I thought so or I wouldn't have bought them. We were right in the ring, and I always look at a mule's mouth and stroke his ears and try to make up my mind whether he is all right before I buy him, and I was down there doing that. I have been in the mule business forty years. I think I can determine by an examination of them at the time I am buying them whether they are sick or not. These were well mules."

The evidence showed further that a white substance, sodium

sulphate, was found on the railroad right of way adjoining the unloading pen of the carrier where the mules were fed and watered in the course of shipment. Dr. George Shirley, a veterinarian, testified that sodium sulphate had been absorbed in the pen. He stated: "You couldn't look at it with your natural eye. . . When I examined the pen on Christmas day, 1944 [the day after the mules were fed and watered by the carrier] there were some lumps there. They were kind of whitish in color, but they had lots of mud on them, where the mules had been walking on top of it. I didn't examine the lumps found in the pen, but it looked like some of that same stuff on the railroad track."

A post-mortem examination of the intestinal contents of one of the mules by a bacteriologist showed the presence of sodium sulphate in large quantities, and the veterinarian testified that sodium sulphate in such quantities was sufficient to cause the death of a mule.

The post-mortem examination of the mule by the bacteriologist and the hypothetical questions answered by two veterinarians, together with the other evidence, authorized a finding that the sodium sulphate found in and near the unloading pen of the carrier caused the sickness and death of the mules. This is true even though the mules were delivered by the carrier at destination without visible or manifest injury or damage, but died within twenty-four hours after delivery.

Even if the burden remained all the while upon the plaintiff, and the defendant was merely put upon proof to absolve itself, the evidence would have authorized the verdict for the plaintiff.

*Judgment affirmed. Gardner and Townsend, JJ., concur.*